UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLOYD E. GALLEGOS,

               Plaintiff,              Case No. 1:10-cv-448

v.                               Hon. Robert J. Jonker

CITY OF BATTLE CREEK,

               Defendant.

_____/

### REPORT AND RECOMMENDATION

This is a civil action brought by plaintiff Floyd E. Gallegos (sometimes referred to as "Gallegos") pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendant's motion for summary judgment and dismissal (docket no. 71) and plaintiff's motion for summary judgment (docket no. 75). The Court will dispose of these motions without oral argument pursuant to W.D. Mich. LCivR 7.2(d).

    **I.**      **Discussion**

    **A.**      **The Amended Complaint**

    **1.**      **Gallegos' allegations**

Gallegos' allegations as set forth in his amended complaint can be summarized as follows.[1] Gallegos, a Native American and Latino, was the owner of real property located at 242 Hamblin Avenue, Battle Creek, Michigan (variously referred to as "242 Hamblin," "the subject property" and the "Hamblin Center") and "currently occupies" the property. Amend. Compl. at ¶

---

[1] Gallegos verified the allegations in his amended complaint pursuant to 28 U.S.C. § 1746, declaring under penalty of perjury that he has personal knowledge of the matters contained in the amended complaint and that the allegations are true and accurate. *Id.* at p. 13.

1 (docket no. 3).  Defendant City of Battle Creek (the "City") is a Michigan municipal corporation located in Calhoun County, Michigan.  *Id.* at ¶ 2.

In June, 2003, plaintiff bought 242 Hamblin from the Battle Creek Area Habitat for Humanity, Inc. ("Habitat for Humanity") on a land contract with an agreed purchase price of $200,000.00 and a down payment of $20,000.00.  *Id.* at ¶¶ 7, 10.  The subject property had a history of use as a community center dating back to the Second World War, with recent uses as a community center ("Hamblin Community Center") and roller rink "Little Wheels Roller Skating Rink."  *Id.* at ¶ 6.  Habitat for Humanity had used the subject property as a warehouse and retail store.  *Id.* at ¶ 5.  Gallegos purchased the subject property "with the intention to use it both as a youth center for dances and recreation, after-school clubhouse and/or community center, and a center to accommodate weddings, meetings and possibly banquets."  *Id.* at ¶ 7.  In June 2003 (the same month of the purchase), the subject property began to be used as a community center, known as the "Hamblin Center for Individual and Community Development"  *Id.* at ¶ 13.  The Hamblin Center held a few dances for neighborhood teenagers without any problems or complaints of misbehavior.  *Id.* at ¶ 14.

The Hamblin Center was in the process of undergoing improvements to return to its original use as a community center until the City ordered a "stop work" advising plaintiff that a shooting occurred on the premises and the building had to close.  *Id.* at ¶ 15.  The City later retracted the statement because no shooting occurred on the premises.  *Id.* at ¶ 16.  Sometime later, a City representative advised Gallegos that it was closing the Hamblin Center for code violations related to the assembly use, capacity, restroom compliance, parking, and storm drainage.  *Id.* at ¶ 17.  Gallegos claims that he remedied the code issues, but the City would not issue a certificate of

occupancy unless Gallegos obtained a parking variance.  *Id.* at ¶ 18.  Gallegos does not allege any

dates as to when key events occurred, i.e., the "stop work" order, the alleged shooting, the notice

of code violations, his remedy of the code violations, his request for a certificate of occupancy, or

the City's refusal to issue a certificate of occupancy.  Gallegos does allege that the City issued a

"Cease and Desist" order in February 2004 which prevented him from occupying the subject

property as a community center.  *Id.* at ¶ 35. However, as discussed in more detail below, there is

no record of such an order.[2]

Gallegos sought a parking variance to reduce the number of parking spaces required,

which the City approved on June 8, 2004.  *Id.* at ¶ 20. However, on July 26, 2004, the City denied

Gallegos' request to waive the paving requirements for the parking spaces.  *Id.* at ¶ 21.  Then, the

City brought up a new issue, claiming "that the property needed a storm water redesign, in which

an on-site detention system must be installed."  *Id.*   In September 2004, the City Building Inspector

sent Gallegos' architect a letter outlining the reasons why his site plan would not be approved.  *Id.*

at ¶ 22.  Gallegos does not provide the relevant contents of this letter.

Gallegos does not allege any specific event or particular activity which occurred

during the next two years, from October 2004 through October 2006.  While Gallegos alleged that

he worked with the City "to sort out all of the issues it claimed existed on the property" during this

time period, he  does not provide any specific examples of these "issues."  *Id.* at ¶ 23.  Rather,

Gallegos set forth a vague allegation that:

---

[2] The court notes that despite alleging numerous facts of events that occurred from 2003 through 2010, Gallegos' amended complaint neither sets forth a coherent chronology of events nor cites the portions of the local laws relevant to his attempt to develop the subject property.

[O]nce a claimed "code" violation was remedied, the [City] added a new "code" violation to remedy that precluded [Gallegos] from securing a certificate of occupancy to re-open the property.

*Id.* Without setting forth any particular code violation or remedies of those violations, Gallegos alleged that "[t]he aforementioned code remedies were not applied to the City's own properties or to neighboring properties and other properties in Battle Creek." *Id.* at ¶ 24.

One of Gallegos' main claims is that the City failed to execute a timely license agreement for the parking areas adjacent to the subject property. Gallegos alleged that the City passed a resolution in November 2006 to grant him a license to use and maintain the property as parking areas. *Id.* at ¶ 34. However, it was not until March 4, 2009, "after numerous delays, drafts, and long, drawn-out negotiations," that the City finally approved the License agreement to maintain the property as parking areas. *Id.* at ¶ 34.

On June 22, 2007, after receiving the "Plan Review from Engineering," Gallegos' "permit was put on hold by the City." *Id.* at ¶ 29. Gallegos does not identify the permit; although based on his previous allegations, he is apparently referring to the occupancy permit (first discussed in 2003 or 2004). On July 7, 2007, when Gallegos attempted to clean the subject property, was told to leave the property by a City building inspector and threatened with possible arrest. *Id.* at ¶ 30.

Gallegos alleges that on July 18, 2007, the State of Michigan Liquor Control Commission approved Gallegos' request "to transfer ownership and location for a new Entertainment Permit." *Id.* at ¶ 31. He does not explain the City's involvement, if any, in obtaining this permit.

Gallegos does not allege any incident which occurred with the City from July 7, 2007 through August 2009, with two exceptions. First, as previously discussed, plaintiff alleges that the

license agreement for the parking was executed in March 2009.  Second, plaintiff alleges that sometime before August 10, 2009, he met with Susan Bedsole (sometimes referred to as  Susan Bledsole), the City's Licensing and Compliance Director, "who confirmed that the [City] made mistakes in its handling of [his] project."  *Id.* at ¶ 36.  At that meeting, the City's representatives advised plaintiff that the project had been around so long that it was considered "abandoned" and that the City would start over in its review of the plans.  *Id.*

On August 10, 2009, Gallegos filed an appeal with the City's Zoning Board of Appeals and sent a letter to the City's planning director, advising that he (Gallegos) was still waiting for approvals from the City.  *Id.* at ¶ 37.  The City did not schedule a hearing for this matter with the Zoning Board of Appeals.  *Id.* at ¶ 38.

Gallegos does not allege any particular conduct that occurred in 2009.  Gallegos alleges that on January 23, 2010, he submitted an appeal to the City's Construction Board of Appeals, objecting to the interpretation of certain building code provisions imposed on his property and requested that his use be considered under the Rehabilitation Code because there was (1) no change of use and (2) no vacancy for more than 180 days.  *Id.* at ¶ 39.  Because the City never acted on Gallegos' appeal, it was "effectively denied" under the City's Ordinance and Michigan law after 30 days had lapsed.  *Id.* at ¶ 42.[3]  In an apparent attempt to explain any deficiencies in appealing the City's actions, Gallegos alleges that he was never advised by a City official regarding an appeal process regarding the building code violations claimed by the City.  *Id.* at ¶ 32.

On March 4, 2010, Gallegos sent an FOIA request under Michigan law for "any and all" public records within the City pertaining to Gallegos and "his property as Hamblin Avenue."

---

[3] Gallegos does not cite any provision of the City's Ordinance or Michigan law in support of this allegation.

*Id.* at ¶¶ 44, 47, 50.  On March 5, 2010, the City Clerk sent a letter explaining that Gallegos' request was too vague to be processed and no documents could be provided.  *Id.* at ¶ 45.  On March 8, 2010, Gallegos appealed the City's denial of his request.  *Id.* at ¶ 46.  On March 26, 2010, the City Attorney responded to the FOIA request, but did not provide the documents until March 29, 2010. *Id.* at ¶ 48.  Plaintiff maintains that the City's FOIA response was incomplete and that it failed to respond to Gallegos' appeal in violation of Michigan's FOIA.  *Id.* at ¶¶ 49-50.

### 2.      The City's alleged motives for acting against Gallegos

Gallegos has identified four motives for the City's purported interference with his property.  First, Gallegos believes that the City's delays and failure to issue occupancy permits is because of its "desire to remove his building from the premises, leave it as open space."  *Id.* at ¶ 25. Second, believes that the City wanted to punish him "for his decision to locate the Battle Creek 'Firekeepers Casino' adjacent to the I-94 expressway rather than downtown Battle Creek as it wanted."  *Id.* at  ¶ 26.  While expressing this belief, Gallegos does not set forth any facts in the amended complaint which identify him as a decisionmaker responsible for locating the Firekeepers Casino.  Third, Gallegos believes that the City would not approve his requested land use based upon his status as a Native American and Latino.  *Id.* at ¶ 27.  Fourth, Gallegos believes that the City was retaliating against him for statements made by him in public forums opposing the City's land use policy and "other acts of discrimination."  *Id.* at ¶ 28.  While expressing this belief, Gallegos does not set forth any facts in the amended complaint which identify his statements which gave rise to the City's alleged retaliation.

### 3.      Gallegos' causes of action against the city

Based on these facts, Gallegos has alleged four counts of misconduct against the City. In Count I, Gallegos alleges that the City has deprived and continues to deprive him of his right to equal protection under the laws as secured by the Fourteenth Amendment by selectively enforcing the City's building code. *Id.* at ¶¶ 52-55.  In Count II, Gallegos alleges that the City has deprived and continues to deprive him of procedural due process and substantive due process of law as secured by the Fourteenth Amendment by denying Gallegos the use of his property based on an irrational and discriminatory motivation. *Id.* at ¶¶ 56-58.   In Count III, Gallegos alleges that the City has retaliated against Gallegos for speaking in opposition to the City's discriminatory policies and practices in violation of his First Amendment rights to redress grievances. *Id.* at ¶¶ 59-66.  In Count IV, Gallegos alleges that the City violated portions of Michigan's FOIA. *Id.* at ¶¶ 67-69.

### 4.      Gallegos' damages

Gallegos alleges he has invested approximately $240,000.00 to make the subject property safe, accessible, code-compliant and functional for the community. *Id.* at ¶ 35.  However, since February 2004, he has been unable to occupy the subject property and use the property for its "intended purpose" as a  community center. *Id.*  He has run out of  time and resources "to pursue anything." *Id.* at ¶ 33.  In summary, Gallegos states that:

> To date, [Gallegos] has been unable to use his property due to [the City's] obstructive actions, and [Gallegos] has not been able to utilize his liquor license due to [the City's] interference with his property.

*Id.* at ¶ 51.

### B.     Procedural background

On January 20, 2011, the court declined to exercise supplemental jurisdiction over the Michigan FOIA claim (Count IV) and dismissed this claim without prejudice.  This matter is now before the court on the City's motion for summary judgment and dismissal (docket no. 71) and Gallegos' motion for summary judgment (docket no. 75), which have been referred to the undersigned for disposition on report and recommendation.

### II.     The motions for summary judgment

### A.     Legal Standard

Gallegos seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.  *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Both parties have moved for summary judgment.  Because both parties have submitted extensive documentation with their supporting briefs, the court will view the City's motion to dismiss as one for summary judgment.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

8

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Gallegos' standing to bring this action

As discussed in detail, *infra*, the record reflects that both a corporation, Rapid Concrete, Inc., and Gallegos, appear to have had an ownership interest in the Hamblin Center from 2002 through 2009. The City contends that Gallegos does not have standing to bring this action because he did not own the property which is the subject of this § 1983 action. "The issue of

9

standing, and whether a federal court has the power to adjudicate a suit, is the threshold question in every federal case. *Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987). "A plaintiff has constitutional standing if he: (1) shows a concrete and actual or imminent injury in fact; (2) demonstrates that the defendant's conduct caused the injury; and (3) shows that it is likely, as opposed to merely speculative, that a favorable decision will redress the injury." *Miller v. City of Cincinnati*, 622 F.3d 524, 531-32 (6th Cir. 2010).

Here, Gallegos seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any "person" who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. Section 1983 provides in pertinent part:

> Every person who, under color of any statute . . . of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights . . . secured by the Constitution and laws shall be liable . . . in an action at law, [or] suit in equity. . . .

42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"[A] section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000). Such claims can be brought by either a person on his own behalf or by a private corporation on its own behalf. *See, e.g., ANR Pipeline Company v. Michigan Public Service Commission*, 608 F. Supp. 43, 46 (W.D. Mich. 1984) ("[f]ederal courts dealing with corporate claims under section 1983 have consistently concluded that a corporation is an "other person" for section 1983 as long as the

corporation is suing in its own right").  However, because a § 1983 claim is personal to the victim, a shareholder cannot bring such a claim on behalf of a corporation.  *See, e.g., Smith v. Martin*, 542 F.2d 688, 690 (6th Cir. 1976) (a stockholder cannot maintain an action under §§ 1981-1988 for damages suffered by a corporation in which he owns shares).

The City contends that Gallegos has no standing to bring a § 1983 claim against the City because the subject property was owned by a corporation (Rapid Concrete, Inc.) rather than Gallegos.  In his verified amended complaint, Gallegos alleged that "[i]n June 2003, Plaintiff bought a building on land contract at 242 Hamblin Avenue, Battle Creek."  Amend. Compl. at ¶ 7.  This allegation is not supported by the record.  The records at the Calhoun County Register of Deeds submitted to the court do not include Gallegos as an record owner of the subject property.  The parties have submitted a copy of the original (first) land contract for sale of 242 Hamblin, which appears to have been executed on April 5, 1999, between Marvel I. Smith and "[Battle Creek] Habitat for Humanity," which was recorded with the Calhoun County Register of Deeds in Liber 2118, Page 228.  *See* (First) Land Contract (docket no. 83-4); Second Land Contract (docket no. 72-1).  In a Second Land Contract dated March 8, 2002, Battle Creek Area Habitat for Humanity, a Michigan non profit corporation, as vendor, sold 242 Hamblin to Rapid Concrete, Inc., a Michigan Corporation, as purchaser.  *See* Second Land Contract (docket no. 72-1).  Floyd E. Gallegos, the "Secretary/Treasurer" of Rapid Concrete, Inc., signed the contract on behalf of the corporation.  *Id.*  The contract listed a purchase price of $195,000.00, payable by an initial installment of $25,000.00 due at the execution of the contract, with monthly installments in the amount of $1,050.00, with the balance due on or before March 1, 2009.  *Id.*  The purchaser's address was listed as P.O. Box 2525, Battle Creek, Michigan, 49016.  *Id.*  A memorandum of land contract was recorded in Calhoun

County Register of Deeds on or about March 27, 2002 (the date is obscured), in Liber 2438, Page 502. *Id.*

Gallegos testified that he had no recollection of ever providing documentation to anyone at the City of Battle Creek related to his personal ownership of 242 Hamblin.  Gallegos Dep. at p. 148.  The only evidence of that Gallegos has an ownership interest in the property is an undated "Assignment of Purchaser's Interest in Land Contract" between Rapid Concrete, Inc., as assignor, by its president Reveriano Jimenez, and Floyd Gallegos, as assignee.  *See* Assignment (docket no. 83-1).  Although not dated, the document was signed by these two individuals on November 4, 2003. *Id.*

The City contends that this assignment was invalid because there is no evidence that Rapid Concrete, Inc. advised the vendor (Battle Creek Area Habitat for Humanity) of the assignment of its interest as required under the second land contract.  *See* Second Land Contract at ¶ 15 ("Upon assignment of the interest of any party to this contract, a copy of such assignment shall be forthwith served upon the then owner, or owners, of the interest, or interests, in said contract, which copy shall contain the mailing address of the assignee.  Until said copy is so served an assignee of an interest herein shall acquire no rights under the contract as against the parties hereto other than the assignor.").

> By an assignment the vendee [in this case Rapid Concrete, Inc.] conveys to the assignee [in this case Gallegos] his present interest in the lands, together with the right to obtain further interest and final title on performance of the contract.  It has been said the assignee acquires an equitable right of purchase, subject to any equities existing between the original parties to it. *Clark v. Bussard*, 220 Mich. 304, 309, 189 N.W. 873, 875 (1922).  The assignment creates only privity of estate, not privity of contract, between the vendor and the assignee.

*General Electric Company v. Levine*, 50 Mich. App. 733, 736, 213 N.W.2d 811 (1973), *quoting*

*Gorman v. Butzel*, 272 Mich. 525, 530, 262 N.W. 302 (1935) (internal quotation marks omitted).

"Nonassignability provisions in land contracts," such as the one in the second land contract here,

"exist for the benefit of the vendor [Habitat for Humanity] to safeguard performance."  *LaFond v.*

*Rumler*, 226 Mich. App. 447, 455, 574 N.W.2d 40 (1997).  "Under reasonable circumstances, these

restrictions will be enforced solely for that purpose."  *Id.*  This nonassignability provision is a

restraint on the transfer of the subject property.  Restraints on alienation of property are strongly

disfavored in Michigan and when permitted, are strictly construed to  prevent a forfeiture. *See*

*Pellerito v. Weber*,  22 Mich. App. 242, 245, 177 N.W.2d 236 (1970).

   Here, however, it appears that the vendor (Habitat for Humanity) as a practical matter

enforced the nonassignability provision by obtaining a quit claim deed and surrender of the land

contract from its purchaser (vendee), Rapid Concrete, Inc.  In a "Quit Claim Deed and Surrender of

Land Contract Purchaser's Interest" dated April 13, 2009, recorded April 17, 2009, in the Calhoun

County Register of Deeds in Liber 3451, Page 830, Rapid Concrete, Inc., by Floyd E. Gallegos as

its "owner/president," transferred any interest held in the subject property by the corporation to

Habitat for Humanity.  *See* Quit Claim Deed (docket no. 73 at p. 19). While Gallegos may have had

a personal interest arising out of the November 4, 2003 assignment from Rapid Concrete, Gallegos'

interest in the actual property itself expired as against Habitat for Humanity when Rapid Concrete,

Inc. surrendered the second land contract and its right to the subject property to Habitat for

Humanity.  Gallegos, of course, knew this since he was the one who surrendered the property.  The

assignee (Gallegos) of a purchaser (Rapid Concrete) under a land contract is entitled to the same

rights and obligations as the original purchaser, his assignor.  *See Lutz v. Dutmer*, 286 Mich. 467,

485, 282 N.W. 431 (1938) ("[u]pon assignment by the purchaser, the assignee steps into the shoes of the purchaser").[4]

   The City points out that Rapid Concrete, Inc. executed the quit claim deed more than four years after the corporation had been dissolved, having produced a document from the website of the Michigan Department of Energy, Labor and Economic Growth which indicates that Rapid Concrete, Inc. was subject to automatic dissolution on July 15, 2005.  *See* Corporate Details (docket no. 73 at p. 17).  This dissolution, however, does not invalidate the corporation's conveyance.  A dissolved Michigan corporation may continue to exist beyond its date of dissolution only until its has concluded "winding up its affairs."  *Flint Cold Storage v. Department of Treasury*, 285 Mich. App. 483, 495-96, 776 N.W.2d 387 (2009).   M.C.L. § 450.1833 provides that  a dissolved corporation continues in its corporate existence until it winds up its corporate affairs:

> Except as a court may otherwise direct, a dissolved corporation shall continue its corporate existence but shall not carry on business except for the purpose of winding up its affairs by:
>
> (a)  Collecting its assets.
>
> (b)  Selling or otherwise transferring, with or without security, assets which are not to be distributed in kind to its shareholders.
>
> (c)  Paying its debts and other liabilities.
>
> (d)  Doing all other acts incident to liquidation of its business and affairs.

---

[4] The court notes that Gallegos did not re-assign his interest in the subject property back to Rapid Concrete, Inc. Prior to April 13, 2009.  However, Gallegos lost his right to obtain the subject property by virtue of Rapid Concrete, Inc.'s quit claim deed and surrender of the second land contract.  *See Gorman,* 272 Mich. at 530 (assignees equitable right of purchase under the assignment was subject to any equities existing between the original parties to the land contract); *General Electric Company,* 50 Mich. App. at 736 (same).

In this regard, subject to § 450.1833 and, except as otherwise provided by court order, "a dissolved corporation, its officers, directors and shareholders shall continue to function in the same manner as if dissolution had not occurred,"  M.C.L. §§ 450.1834, and "[t]itle to the corporation's assets remains in the corporation until transferred by it in the corporate name," M.C.L. § 450.1834(b). Pursuant to M.C.L. §§ 1833 and 1834, it appears that Rapid Concrete, Inc. retained its interest in the second land contract after its dissolution and could transfer that asset in the corporate name.

Based on this rather convoluted record, genuine issues of material fact exist with respect to whether Gallegos owned the subject property and had standing to bring a § 1983 action against the City.  Viewing the evidence in the light most favorable to Gallegos, it would appear that he obtained an ownership interest in the property when Rapid Concrete, Inc., assigned him the land contract on November 4, 2003.  Because Gallegos had no ownership interest in the subject property until this assignment, he has no standing to assert a § 1983 claim arising from the ownership of the subject property for any act that occurred prior to November 4, 2003.  In addition, for the reasons stated above, any interest which Gallegos had in the property terminated when Rapid Concrete, Inc. executed the quit claim deed and surrendered the land contract for Habitat for Humanity on April 13, 2009, approximately a month after the final payment on the second land contract had been due.  Accordingly, the City's motion for summary judgment should be granted, in part, as to Gallegos' § 1983 claims for injuries which occurred before November 4, 2003 (when he first acquired an interest through the assignment of the second land contract) and after April 13, 2009 (when Rapid Concrete, Inc. surrendered the second land contract, and with it any rights to the property itself that Gallegos may have had as an assignee).

15

**C.      The statute of limitations bars Gallegos' claims which accrued prior to May 10, 2007**

**1.      The applicable statute of limitations in a § 1983 action**

Gallegos filed this § 1983 action on May 10, 2010.  The City contends that all of his claims which arose prior to May 10, 2007 are barred by the applicable statute of limitations.  "Because Congress did not specifically adopt a statute of limitations governing § 1983 actions, federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought."  *Wolfe v. Perry*, 412 F.3d 707, 713-14 (6th Cir. 2005) (internal quotation marks omitted).  The statute of limitations for a § 1983 claim in Michigan is three years, based upon Michigan's three-year statute of limitations for injury to a person or property, M.C.L. § 600.5805(10).  *Chippewa Trading Company v. Cox*, 365 F.3d 538, 543 (6th Cir. 2004).   However, "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (emphasis in original).  *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003) ("the duration of the statute of limitations for § 1983 actions is governed by state law; however, federal standards govern when the statute begins to run").

"The date on which the statute of limitations begins to run in a § 1983 action is a question of federal law."  *Eidson v. State of Tennessee Department of Children's Services*, 510 F.3d 631, 635 (6th Cir. 2007).   Under federal law, the statute of limitations for a § 1983 action "begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action and that a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence."  *McCune v. City of Grand Rapids*. 842 F.2d 903, 905 (6th Cir. 1988).  As the Supreme Court explained in *Wallace*:

> Under the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages. The cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief.

*Wallace*, 594 U.S. at 391 (internal quotation marks and citations omitted).

### 2.    The eight "official actions" which Gallegos identified in his motion for summary judgment

Gallegos has not submitted a chronology of events from which the court can determine when his various claims accrued. Rather, his motion for summary judgment identifies eight "official actions" upon which his claims against the City are based. *See* Gallegos' Brief at pp. 5-6 (docket no. 75-1).[5]

### a.    Variance for parking

Gallegos claims that the City required him to seek a variance for parking for his building, when in fact it was a prior lawful nonconforming use requiring no variance. Gallegos Brief at p. 5. (docket no. 75-1). Gallegos refers to the City's Planning and Zoning Code, Chapter 1288 (Nonconforming Uses), but does not point to any particular section of that chapter. Exh. 10 (docket no. 77-1). The government action with respect to the parking issue occurred on or before March 3, 2004. In this regard, Gallegos' architect identified parking as "the biggest stumbling block" to the project in a letter to Gallegos dated March 3, 2004. *See* discussion in § II.C.4.c., *infra*.

### b.    Stop work order

Gallegos claims that the City posted a stop work order without notice and an opportunity to be heard. However, Gallegos does not state when the "stop work order" was issued

---

[5] Unless otherwise specified, the court will refer to the page number which appears on the face of the brief or response, rather than the page number assigned at the top of the page by the court's docketing system.

and has not presented any evidence of such an order.  The City has provided a copy of a "Notice of Violation" dated February 12, 2004, addressed to Marvel Smith regarding 242 Hamblin.  Notice of Violation (docket no. 72-5).  It appears that this is the alleged "stop work order."  *See* discussion in §II.C.3.c., *infra*.

### c.      City lost his plans

Gallegos claims that the City repeatedly lost his renovation plans.  Gallegos' Brief at pp. 5.  However, Gallegos later clarifies in his brief that the City only lost one set of plans (i.e., he submitted renovation plans in 2006 after the City lost his 2004 renovation plan).  *Id.* at p. 7.

### d.      Special Land Use Approval

Gallegos raises a claim with respect to the fact that he did not obtain a "Special Land Use Approval."  However, Gallegos does not articulate this claim, other than to state that the City violated his federal rights by "alleging in defense of this case that Plaintiff was not secure [sic] Special Land Use Approval when in fact, the City had found the Plaintiff's proposed use was consistent with the zoning designation."  *Id.* at p. 5.

### e.      Certificate of occupancy

Gallegos claims that the City required him to secure a Certificate of Occupancy when prior owners and other building owners where not required to secure an occupancy permit.  Gallegos Brief at p. 5.  This issue arose during the initial phases of Gallegos' dealings with the City, certainly before the City granted him a parking variance in June 8, 2004.  *See* Amend. Compl. at ¶ 20.

### f. Building Code

Gallegos claims that he was required "to conform his building renovations to the current day building code instead of the Michigan Rehabilitation Code or its predecessor, the Existing Building section of the Michigan Building Code." Gallegos Brief at p. 5.

### g. Changed building code "use"

Gallegos claims that the City unilaterally changed the building code "use" of his building without notifying him. Gallegos Brief at p. 5.

### h. Parking license agreement

Gallegos claims that the City manager failed to sign a parking license agreement for three years after the City Council approved it, the City Attorney approved it, and Gallegos signed it. Gallegos' Brief at pp. 5-6. The City Manager's refusal "to execute the deal" resulted in Gallegos' not be able to use his property. *Id.*

### 3. The four "official actions" identified in Gallegos' response to the City's motion for summary judgment

In his response to the City's motion for summary judgment, Gallegos points to four "official actions" as evidence of the City's "policy or custom" to deprive him of his rights:

(1) Posting a stop work order without notice and an opportunity to be heard;

(2) Requiring Plaintiff to seek a variance for parking for his building when in fact, it was a prior lawful nonconforming use requiring no variance;

(3) Requiring Plaintiff to secure a Certificate of Occupancy when prior owners and other building owners where not required to secure an occupancy permit;

(4) The City manager failing to sign a parking license agreement for three years after the City Council approved it, the City Attorney approved it, the Plaintiff signed it but the City Manager refused to execute the deal which resulted in Plaintiff not being able to use his property.

19

Gallegos Response at pp. 12-13.[6]

### 4.    Continuing violation tolled the statute of limitations

### a.    Gallegos' continuing violation claim

In response to the City's statute of limitations arguments, Gallegos asserts that his claims have been tolled since an unspecified date in 2004 due to continuous violations by the City, which deprived him of use of the building for six years. Gallegos' Response at p. 10 (docket no. 83). Gallegos identified four incidents which establish his claim as a continuing violation.

First, Gallegos asserts that the "zoning wrong" commenced in 2004 "with [the City] disregarding its own policies of having the building department review [Gallegos'] renovation plans instead [sic], but rather, went to planning." *Id.* Gallegos provides no particular date in 2004 for this occurrence, referring only to Exhibit 4 "Bedsole dep. p. 7, 45." *Id.* On these two deposition pages, Ms. Bedsole testified that her current job title was Director of Licensing and Compliance, that she has held this position since January 2008, and that her position oversees several other departments ("City clerk's office, planning department, community development, inspections, code compliance, [and] neighborhood services"). *See* Bedsole Dep. at p. 7 (docket no. 75-5). Bedsole testified that "[s]ite plan review is done by the Department of Public Works, by the Planning Department and by the Inspections Department," while "a renovation plan" is "just reviewed by the Inspections Division." *Id.* at p. 45.

---

[6]Gallegos' motion for summary judgment listed eight rather vague "official actions" by the City which he claims violated his constitutional rights. *See* § II.C.2. However, in his response to the City's motion for summary judgment, Gallegos modified his position by restating four specific "official actions" as evidence of a municipal policy or custom to deprive him of his constitutional rights. *See* § II.C.3. For purposes of this report, the court will consider the four "official actions" as the basis of Gallegos' claims against the City.

Second, Gallegos asserts that the initial "zoning wrong" continued when the City improperly required him to secure an additional 75 parking spaces before he could secure an occupancy permit. *Id.* Gallegos provides no particular date for this occurrence, citing only "Exhibit 19." However, this exhibit (an e-mail dated February 13, 2007 from the City's Environmental Programs Coordinator), makes no reference to the 75 parking spaces. *See* Exhibit 19 (docket no. 78-5).

Third, Gallegos refers to securing the parking spaces through a lease with the City. Gallegos' Response at p. 10. Gallegos provides no particular date for this event, citing only "Exhibit 23." *Id.* This exhibit appears to be a copy of a Battle Creek City Commission meeting from November 21, 2006, in which the Commissioner resolved "that the City Manager is authorized to sign a Grant of License to Floyd Gallegos, as Licensee, to improve, use and maintain the attached describe premises as parking areas, provided, however, there shall be no vehicular parking or vehicular access on the portion of the described premises to the rear of the Licensee's property along the Battle Creek River." Battle Creek City Commission Proceedings (Nov. 21, 2006) (docket no. 79-4).

Fourth, Gallegos asserts that the City refused to finalize the parking arrangement for three years (the City Manager refused to sign the lease) citing Exhibit 26 (a copy of the executed license). Gallegos' Response at p. 10; License agreement (docket no. 80-2). Gallegos further states that the City Manager knew he could do nothing with the property at that time citing Exhibit 19 (the February 13, 2007 e-mail from the City's Environmental Programs Coordinator) and referencing a statement in the e-mail that "since the property issue is not finalized with the City, the site plan

approval would be contingent upon the finalization of your agreement [i.e., the license agreement] with the City."  Gallegos' Response at p. 10.

### b.    Legal standard

The Sixth Circuit has summarized the test for determining whether a continuing violation exists in a § 1983 action as follows:

> First, the defendant's wrongful conduct must continue after the precipitating event that began the pattern  .  .  .  .   Second, injury to the plaintiff must continue to accrue after that event.  Finally, further injury to the plaintiff[ ] must have been avoidable if the defendants had at any time ceased their wrongful conduct.

*Eidson*, 510 F.3d at 635, quoting *Tolbert v. State of Ohio Department of Transportation*, 172 F.3d 934, 940 (6th Cir. 1999).  "[A] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation."   *Id.*   Furthermore, "[p]assive inaction does not support a continuing violation theory."  *Eidson*, 510 F.3d at 635.[7]

The Sixth Circuit recognizes two categories of continuing violation.  *Bowerman v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 12*, 646 F.3d 360, 366 (6th Cir. 2011).   "The first is 'where the plaintiff can show prior [wrongful] activity that continues into the present,' and the second is 'where the plaintiff can show a longstanding and demonstrable policy of discrimination.' *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir.2003) (internal quotation marks and citation omitted)."  *Id.*   Here, Gallegos

---

[7] The City points out that in *Garg v. Macomb County Community Mental Health Services*, 472 Mich. 263, 696 N.W.2d 646, *amended* 473 Mich. 1205 (2005), the Michigan Supreme Court eliminated the "continuing violations doctrine" which had been read into Michigan's statute of limitations, M.C.L. § 600.5805 and applied in certain state civil rights actions.  However, this court is not bound by *Garg*.  While § 1983 borrows the state's statute of limitations, federal law determines when that statute of limitations begins to run and whether a continuing violation occurred.  *See Wallace*, 549 U.S. at 388; *Eidson*, 510 F.3d at 635; *Sharpe*, 319 F.3d at 266.

contends that he is entitled to a continuing violation under the first category, i.e., there is a continuing violation which consists of prior wrongful activity that continues into the present.

### c. A chronology of Gallegos' claims

Gallegos' submissions do not demonstrate a continuing violation which would toll the statute of limitations. The record reflects contacts between Rapid Concrete, Inc., and Kim Tuck, the City's Chief Building Official, during the summer of 2002, when an unidentified person from the corporation contacted the City's Building Department to inquire about what would be required to use the building for an "assembly use." Tuck responded in a letter dated July 17, 2002 outlining the requirements under the "codes" for such a renovation for a building with design occupancy of approximately 600 people. Tuck Letter (July 17, 2002) (docket no. 72-4 at p. 29). These requirements included approximately 70 parking spaces (including 3 barrier free spaces); restroom facilities for men and women; drinking fountain; service ink; barrier free access from the parking lot; heating/ventilation systems that could meet the current code standards; permits for the modifications to convert the building to an assembly use; and plans signed and sealed by a State of Michigan registered architect or engineer. *Id.* Tuck testified that he toured the subject property in August 2002, inspected the rough footings of a handicap ramp after Rapid Concrete, Inc., requested a building permit for the ramp, and after reviewing the site designated the use of the property on the permit as S1, S2 and U (i.e., Storage-1, Storage-2 and Utility). Tuck Dep. at pp. 48-50 (docket no. 72-4 at pp. 9-11); Building Permit (ramp) (docket no.72-4 at p. 31); 2006 Michigan Building Code at § 302 (Classification) (docket no. 72-5 at p. 8).

Gallegos' dispute with the City appears to have commenced sometime after he acquired an interest in the property in November 2003 (several months after the alleged initial use

23

as a youth center in June 2003).  In a letter dated November 19, 2003, Architect Larry L. Rizor advised Gallegos that his future use of the subject property as a youth center for dances and recreation, and as a community facility for weddings, meetings and banquets could be accommodated.  *See* Rizor Letter (Nov. 19, 2003) (docket no. 72-5 at pp. 2-3).  The letter advised Gallegos that the assembly activities would require adequate parking and restroom facilities to meet local zoning and Michigan building codes.  *Id.*  However, Rizor felt that "[t]he existing building and its historical use as a community center, and military USO use during the war, should put the building under existing building rehabilitation code, which is less stringent than new building code." *Id.*  In addition, Mr. Rizor noted that the building's "end use" as a community facility was consistent with historical use and that "some code requirements should be able to be grand fathered."  *Id.*  Mr. Rizor further advised Gallegos that "[t]he construction of the building will require upgrades in mechanical and electrical systems to accommodate assembly activity, as other past users have installed systems unable to accommodate assembly functions."  *Id.*  Mr. Rizor quoted Gallegos the costs of performing: an overlay concept site plan (which included acquisition of vacant lots owned by the City, zoning set back requirements that limit building and site development, parking capacity, etc.); preparation of building plan, elevations, and sections of the existing building on computer; and concept elevations of proposed improvements.  *Id.*  Gallegos testified that he relied on Rizor as the architect (or one of the architects) who submitted plans on the 242 Hamblin project.  Gallegos Dep. at pp. 165-66.  The record includes a newspaper article advertising a "Rap Battle" at the subject property on December 19 and 20, 2003 with a $10.00 admission.  *See* Battle Creek Enquirer Advertisement (Dec. 11, 2003) (docket no. 72-5 at p. 11).  Rizor testified at his deposition that he

24

was aware of this use, which occurred after Gallegos retained him. Rizor Dep. at p. 38 (docket no. 72-4 at p. 21).

On February 12, 2004, several weeks after the "Rap Battle," Tuck issued a Notice of Violation letter to the property owner Marvel Smith, at the address provided by Rapid Concrete, Inc. (i.e., P.O. Box 2525, Battle Creek, MI 49016). *See* Notice of Violation (docket no. 72-5 at pp. 13-14); Second Land Contract. In the Notice of Violation , the City advised the property owner of the violation which included the following statement:

> It has come to our attention that the building located at 242 hamblin Ave. is being used for assembly purposes in violation of the State of Michigan Building Code, section 110. Since the building was formerly classified as a combined storage and business use a new certificate of occupancy is required when a change in use occurs.

*See* Notice of Violation. The Notice provided essentially the same information regarding necessary upgrades as Tuck sent to Rapid Concrete, Inc. in July 2012. *See* Tuck Letter (July 17, 2002). Finally, the Notice of Violation required the owner cease its use until a certificate of occupancy was issued:

> **Therefore you are to immediately cease using the building for assembly purposes until such time as a certificate of occupancy has been issued for the new use.** Failure to respond may result in civil penalties and or other court ordered remedies.

Notice of Violation (emphasis in original).[8]

In a letter dated March 3, 2004, Gallegos' architect (Rizor) advised Gallegos that the subject property was currently zoned as I-1 Light Industrial. Rizor Letter (March 3, 2004)(docket

---

[8] While the 2004 Notice of Violation was issued under the Michigan Building Code, neither party has submitted a copy of the relevant code provision. The City has provided a copy of § 110.1 of the *2006* Michigan Building Code. *See* docket no. 72-5 at p. 6. Gallegos provided a small portion of the 2003 Michigan Building Code but did not provide the relevant section. *See* docket no. 77-4.

no. 72-5 at pp. 17-18).  Rizor advised Gallegos that parking was "the biggest stumbling block for

the intended use" of the subject property.  *Id.*  Rizor also advised that Gallegos that once he (Rizor)

established an "occupancy load" for the building and achieved zoning approval, he (Rizor) could

determine the extent of the building and site improvements.  *Id.*

    Rizor's letter did not advise Gallegos that the zoning ordinance required a special

land use permit for such use in the I-1 district.  *Id.* However, Michael J. Buckley, the City's Director

of the Planning and Zoning and Community Development departments, stated in an affidavit that:

> At some point after Rapid Concrete, Inc. had moved into the building, Floyd
> Gallegos stopped into my office to discuss a proposed use of the building at 242
> West Hamblin as a privately operated community center.  I informed Mr. Gallegos
> at that time that the use as a privately operated community center would require a
> special land use permit under the Zoning Ordinance.

Buckley Aff. at ¶ 7 (docket no. 72-4 at pp. 2-3).  Gallegos contends that the deposition testimony

of other City employees contradicts Buckley's position that Gallegos needed a special land use

permit.  Gallegos Response at pp. 5-6.[9]  Notwithstanding whether Buckley was correct, it does not

appear from the evidence that plaintiff took any steps at this time to resolve the issue.

    As previously discussed, Gallegos has provided evidence that the City Commission

authorized the city manager to enter into a grant of license to Allegos for the additional parking

spaces on November 21, 2006.  The record reflects that a license agreement was ultimately prepared

by Gallegos' attorney, the law firm of Vandervoort, Christ & Fisher, P.C. (sometimes referred to as

---

   [9] Gallegos seeks to strike this affidavit as inconsistent with the deposition testimony of other City employees and with his own affidavit.  Gallegos Response at pp. 6-8.  The court finds no basis to strike this affidavit, which does not contradict any previous testimony given by Buckley.  *See generally, Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003) ("[w]hen a motion for summary judgment has been filed, a party cannot create a factual issue by filing an affidavit which contradicts earlier testimony"); *Pellegrino v. McMillen Lumber Products Corp.*, 16 F.Supp.2d 574, 582 (W.D. Pa. 1996) ("[i]t is well established in this Circuit and others that a plaintiff can not create a genuine issue of fact sufficient to withstand summary judgment merely by submitting an affidavit which contradicts her prior sworn testimony").

the Vandervoort law firm") in 2009; that the license stated an effective date of March 4, 2009; that the license was signed by Gallegos on March 4, 2009; that the license was approved by the City Attorney on April 6, 2009; and that the license was signed by the Assistant City Manager (James Ritsema) on April 6, 2009.  Exh. 80-2.  The license agreement granted "Floyd Gallegos, a married man" a license to use property adjacent to 242 Hamblin for parking space.  *Id.*

     **d.**      **Discussion**

Gallegos argues the constitutional violations stem from the City's failure to have his property matter be addressed by "building department review" in 2004.  Essentially, Gallegos claims that the City started down the wrong path in 2004 and that his dispute with the City is part of that single continual violation. After reviewing Gallegos' claims and the materials on file in this action, the court concludes that Gallegos has failed to establish a continuing violation.  Rather, his action involves the continued effects of an allegedly improper decision made by the City in 2004.   "A continuing violation in a § 1983 action occurs when there are continued unlawful acts, not by continued ill effects from the original violation."  *Kovacic v. Cuyahoga County Department of Children and Family Services*,  606 F.3d 301, 308 (6th Cir. 2010).  Gallegos had reason to know of this alleged violation by the City back in 2004.  The eight "official actions" of which plaintiff complains are not a continuation of that alleged unlawful act, but, at most, the "continued ill effects from the original violation."  *See Kovacic*, 606 F. 3d at 308.

Gallegos relies on  the Sixth Circuit's opinion in *Gordon v. City of Warren*, 579 F.2d 386 (6th Cir. 1978), which involved an ordinance which referred to a "master thoroughfare plan" which effectively prohibited the erection of any structure within 200 feet of a proposed right of way. Gordon, 579 F.2d at 387.  When the authorities discovered a mistake, the planning commission

issued a stop work order that required the dismantling of four partially completed apartment buildings within the 200 foot set-back area. *Id.* When the owners refused to dismantle the buildings, the city obtained an injunction which directed that two of the buildings be removed. *Id.* The parties appealed and eventually the Michigan Supreme Court found that the ordinance (which sought to reserve property without compensation to the owner) was unconstitutional. *Id.* The owners subsequently filed a § 1983 claim which was challenged as untimely. *Id.* at 387-88. The Sixth Circuit held the statute of limitations did not begin to run on the plaintiffs' § 1983 claim until the Supreme Court of Michigan decided that the ordinance was invalid. *Id.* at 392. Until that time, the defendants engaged in a continuing course of action that made it impossible for the plaintiffs to enjoy the full use of their property. *Id.* In *Trzebuckowski v. City of Cleveland*, 319 F.3d 853 (6th Cir. 2003), the court pointed out the distinction between a continuing violation and the continuing effect of a prior violation for purposes of the statute of limitations. The court noted that subsequent cases in this circuit and others have distinguished *Gordon* and "further defined the subtle difference between a continuing violation and a continuing effect of a prior violation," *i.e.*, that "the limitations periods begin to run in response to discriminatory acts themselves, not in response to the continuing effects of past discriminatory acts." *Trzebuckowski*, 319 F.3d 858.

Accordingly, Gallegos' claims which accrued more than three years before May 10, 2010, the date he filed this action, are barred by the statute of limitations. Consistent with this determination, the court has identified one instance of the City's alleged wrongful conduct occurring since May 10, 2007 which is relevant to this action, i.e., to wit, City's failure to sign the parking lease agreement, which was the City Commission approved on November 21, 2006, but which was

not executed until April 9, 2009.  *See* Amend Compl. at ¶¶ 34, 36-39, 42.[10]  This is the only alleged

act which survives the statute of limitations and upon which Gallegos has standing to sue under  §

1983.[11]

> ### D.    The City's policy or custom of discrimination

The City contends that Gallegos has failed to identify a policy or custom that would

subject it to liability under  § 1983. The City's liability under § 1983 must be based on more than

respondeat superior, or the right to control employees. *See Monell v. Department of Social Services*,

436 U.S. 658, 691, 694-95 (1978); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Hays v.

Jefferson County, Ky.*, 668 F. 2d 869, 874-875 (6th Cir. 1982).   A plaintiff who sues a city for

constitutional violations under 42 U.S.C. § 1983 must establish that a governmental policy or custom

caused the alleged injury.  *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998), citing

*Monell*, 436 U.S. at 690-691.  "In other words, a municipality can be liable under § 1983 only where

its policies are 'the moving force' behind the constitutional violation."  *Sova*, 142 F.3d 898 at 904,

citing  *Monell*, 436 U.S. at 694.   A municipal policy includes "a policy statement, ordinance,

regulation, or decision officially adopted and promulgated."  *Powers v. Hamilton County Public

Defender Commission*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 690).  In

contrast, an actionable custom  "has  not  received  formal  approval  through .   .   . official

---

[10] While Gallegos also alleged that on June 22, 2007, the City put Gallegos' occupancy permit "on hold" and that on July 7, 2007  "a Battle Creek building inspector" told Gallegos to leave the property and threatened him "with possible arrest," Gallegos does not develop either of these claims in the summary judgment motions.  *See* Amend. Compl. at ¶¶ 29-30.

[11] The court notes that Gallegos' allegations regarding the appeal filed with the City's Zoning Board on August 10, 2009 and the appeal filed with the City's Construction Board of Appeals on January 23, 2010, *see* Amend. Compl. at ¶¶ 37 and 39, are not relevant to the present § 1983 action.  While these claims fall within the three-year statute of limitations, Gallegos has no standing to sue on these claims because they occurred after the second land contract was surrendered on April 13, 2009.

decisionmaking channels." *Powers*, 501 F.3d at 607 (quoting *Monell*, 436 U.S. at 690-91).  "A  §

1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew

about and acquiesced in the practice at issue."   *Powers*, 501 F. 3d at 607.

Gallegos appears to claim that the City's custom and policy was set by individual

officials who made various decisions with respect to the subject property.   A municipality could be

liable for an official's unconstitutional action when the official is the one who has the "final

authority to establish municipal policy with respect to the action ordered."  *Feliciano v. City of*

*Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469,

481 (plurality opinion)).   However, "[m]ere authority to exercise discretion while performing

particular functions does not make a municipal employee a final policymaker unless the official's

decisions are final and unreviewable and are not constrained by the official policies of superior

officials."  *Feliciano*, 988 F.2d at 655.

### 1.    Equal Protection (Count I)

Gallegos claims that the City selectively enforced its zoning and building code

against him in violation of the Equal Protection Clause.  "To state an equal protection claim, a party

must claim that the government treated similarly situated persons differently."  *Braun v. Ann Arbor*

*Charter Township*, 519 F.3d 564, 574 (6th Cir. 2008).  Gallegos claims that he has been subjected

to three different types of selective enforcement claims by the City.

### a.    Equal protection violation arising from discrimination

First, Gallegos claims that the City discriminated against him due to his membership

in a protected class.  This type of equal protection claim requires the plaintiff to establish three

elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Shorter v. Giles County Police Department*, 73 Fed. Appx. 780, 781 (6th Cir. 2003), quoting *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir.2000).

Gallegos testified that he classified himself as "Native." Gallegos Dep. at p. 44. But other than establishing that he is a member of an identifiable group, Gallegos has not established that the City treated him differently because he was a member of that group. Gallegos does not address the elements of an Equal Protection claim, simply asserting that the City arbitrarily discriminated against him based upon his class membership. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

### b. Equal protection violation arising from exercising a constitutionally protected right.

Second, Gallegos claims that the City punished him for exercising a constitutionally protected right. *See Futernick v. Sumpter Township*, 78 F.3d 1051, 1057 (6th Cir. 1996), *overruled on other grounds by Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ("[i]t is also clear that selective enforcement intended to discourage or punish the exercise of a constitutional right, especially the right to criticize the government, is sufficient basis for § 1983 relief"). *See also, Wayte v. United States*, 470 U.S. 598, 608 (1985) (the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification "including the exercise of protected statutory and constitutional rights").

Gallegos alleged that the City had a policy of punishing individuals who spoke out against the City policies or criticized the City. Gallegos apparently relies on his criticism of the City during the negotiation of the location of the Firekeepers Casino. *See* Amend. Compl. at ¶ 26. In this regard, Gallegos testified that he was hired as a consultant to the tribe that runs the Firekeepers Casino. Gallegos Dep. at p. 44. Although he was not a member of the tribe, he sat in on tribal council meetings, and identified the site of the Firekeepers Casino in approximately 1998. *Id.* at p. 46. Gallegos testified that he "chose" the site for the casino adjacent to the Interstate 94 (I-94) expressway and decided that the City was "the wrong place" for the casino. *Id.* at p. 52. Gallegos has not articulated how his participation as a consultant for the tribe in 1998 regarding locating the casino implicates a violation of *his* constitutional rights almost a decade later. Gallegos was not seeking any relief from the City. Rather, he was a consultant representing a third-party in negotiations with the City. Accordingly, the City is entitled to summary judgment on this claim.

### c.    Equal protection violation arising from the City's treatment of Gallegos as a "class of one"

Third, in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court recognized that a successful equal protection claim may be brought by a "class of one," where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

Gallegos contends that the City singled him out by performing the following acts: the improper posting of a stop work order; the failure to apply non-conforming status to the subject property; applying a new building code to the subject property; requiring a certificate of occupancy for the subject property, when the previous owner (Habitat for Humanity) was not required to secure a certificate; requiring Gallegos to seek a zoning variance for additional parking in violation of its

32

established site plan approval process; and the City's "intentional failure" to sign the parking license agreement for three years. Gallegos' Brief at pp. 6-10.

        As previously discussed, Gallegos' claims which accrued prior to May 10, 2007 are barred by the statute of limitations. The only event relevant to Gallegos' equal protection claim is the City's purported delay in executing the parking license agreement. Gallegos contends that the City's delay "singled him out" as a "class of one." Eileen Wickland, the City Attorney, stated in her affidavit that she started work as the City Attorney on March 15, 2008. Wicklund Aff. at ¶ 18 (docket no. 73). Wicklund first became aware of Gallegos' interest in a license for parking areas in on or about November 17, 2008, when Gallegos' attorney (David Lucas of the Vandervoort law firm) contacted her office regarding the license. *Id.* at ¶¶ 6-7. Attorney Lucas sent a facsimile transmission to Wicklund's assistant, Beth Winslow, transmitting a copy of a proposed license document with a legal description and a letter regarding some modifications to the site plan originally submitted on behalf Gallegos. *Id.* at ¶ 7; Lucas Letter (Nov. 17, 2008) (docket no. 73 at p. 7). In the letter, Attorney Lucas stated his understanding that "the Site Plan matters have been fully resolved between the City of Battle Creek and Mr. Rizor [Gallegos' architect] as of the date of this facsimile transmission," and that "Gallegos stands ready to make the changes described in the Site Plan, once the License is granted." Lucas Letter (Nov. 17, 2008). Wicklund's uncontroverted affidavit reflects on-going negotiations between the attorneys for several months through March 20, 2009, when Gallegos' attorney sent her an original license agreement executed by Gallegos. Wicklund Aff. at ¶¶ 6-16. The Assistant City Manager executed the license agreement a few days later on April 6, 2009. *Id.* at ¶ 16.

Gallegos testified that his attorneys handled this matter, "because they understand this legal stuff." Gallegos Dep. at pp. 186-87, and Gallegos apparently relied on his attorneys to take care of this matter. For reasons that are not entirely clear from the record, Gallegos' attorneys did not submit a copy of the proposed license agreement to the City until November 17, 2008.[12] The attorney letter suggests on-going discussions were occurring between the City and Gallegos' architect, Rizor. In this regard, Rizor testified that there were long periods of time when this project was inactive and he did not hear from Gallegos. Rizor Dep. at p. 45. Gallegos' attempts to reach the conclusion that the City discriminated against him because "it took three years" to sign the license agreement. *Id.* at p. 278. The record reflects to the contrary that the license agreement was signed within five months after Gallegos' attorneys submitted a proposed draft of the license agreement to the City. When asked to explain his assertion, Gallegos testified "[t]he reason is, if you go to the City records, there is property being given to this one and that one all the time, and it doesn't take that long." *Id.* Such a vague and baseless proposition hardly provides an adequate basis to support a claim in federal court.

Based on this record, Gallegos has failed to demonstrate that the City "singled him out" by failing to execute the license agreement in a timely manner. Accordingly, the City is entitled to summary judgment on this Equal Protection claim.

---

[12]Negotiations on the license agreement may have started as early 2006, based upon a license agreement signed by Gallegos on November 22, 2006 and forwarded to the court. *See* License Agreement (2006) (docket no. 80-1). In his brief, Gallegos states that the license was signed by him "a week after the City Council and City Attorney approved the license." Gallegos Brief at p. 10. However, Gallegos does not provide further explanation for the disposition of this document. The court notes that this draft is radically different from the license agreement eventually signed by the City in 2009. *See* License Agreement (2006) at ¶3 (Grant of License), ¶ 10 (Signage) and ¶ 14 (Assignment).

### 2.        Substantive Due Process (Count II)

"The substantive component of the Due Process Clause protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.' *Palko v. Conn.*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)." *Doe v Michigan Department of State Police*, 490 F.3d 491, 499 (6th Cir. 2007).  The Sixth Circuit has determined that "citizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Richardson v. Township of Brady*, 218 F.3d 508, 512 (6th Cir. 2000). "A local zoning ordinance survives a substantive due process challenge if there exists a rational relationship between the terms of the ordinance and a legitimate governmental purpose." *Id.* at 513. "[T]o state a substantive due process claim in the context of a zoning case, a plaintiff must establish that (1) a constitutionally protected property or liberty interest exists, and (2) that constitutionally protected interest has been deprived through arbitrary and capricious action." *Hearns Concrete Construction Co. v. City of Ypsilanti*, 241 F.Supp.2d 803, 812 (E.D. Mich. 2003).

Gallegos' remaining claim involves the delay in the execution of the parking license agreement.  Viewing the evidence in the light most favorable to Gallegos, the court concludes that he met the first element because he had a constitutionally protected interest in the subject property since November 4, 2003.  However, Gallegos has failed to demonstrate the deprivation of that interest due to  the City's arbitrary and capricious action.  As previously discussed, Gallegos relied on his attorneys to take care of the license agreement.  When his attorneys submitted a proposed agreement in November 2008, they referred to the resolution of various site plan matters between the City and Gallegos' architect.  While the City and Gallegos' architect engaged in discussions

regarding the subject property, Gallegos has presented no evidence of arbitrary and capricious action

by the City.  The City is entitled to summary judgment on Gallegos' substantial due process claim.

### 3.        Procedural Due Process (Count II)

Gallegos contends that the City violated his procedural due process.  To establish a

procedural due process claim, a plaintiff must demonstrate: (1) a liberty or property interest

protected by the due process clause; (2) a deprivation of that protected interest within the meaning

of the due process clause; and (3) the defendant's failure to afford adequate procedural rights prior

to the deprivation.  *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir.1999).   Gallegos contends that

he was entitled to prior notice and opportunity to be heard before the City issued the "stop work

order" by the City.  Gallegos' Brief at p. 22.  This claim, which allegedly occurred in 2004, is barred

by the statute of limitations and the City is entitled to summary judgment on Gallegos' claim of

procedural due process.

### 4.        Retaliation (Count III)

Finally, Gallegos contends that the City retaliated against him in violation of the First

Amendment.  To prove a First Amendment retaliation claim, plaintiff must establish three elements:

"1) the plaintiff engaged in activities protected by the Constitution or statute;  2) the defendant took

an adverse action that would deter a person of ordinary firmness from continuing to engage in that

conduct; and 3) that this adverse action was taken at least in part because of the exercise of the

protected conduct."  *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).  *See also Thaddeus-X*

*v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).   To establish the causation element of a

retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a

substantial or motivating factor in the defendant's alleged retaliatory conduct."  *Smith*, 250 F. 3d at

1037, *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

        Assuming, for purposes of this claim, that the City took an adverse action against Gallegos, he has failed to establish the first and third elements a retaliation claim, i.e., that he engaged in activities protected by the Constitution and that the adverse action was motivated in part because of his engagement in those activities.  Gallegos has alleged that the retaliation arose from the exercise of his First Amendment right to redress grievances, because he spoke in opposition to the City's discriminatory policies and practices at public forums.  Amend. Compl. at ¶¶ 28, 59-66. However, at his deposition, Gallegos could not identify the forums nor recall the substance of statements.  Gallegos Dep. at pp. 263-64.   In his brief, Gallegos argues that the City retaliated against him because he "sought redress of his grievances for several years by challenging the code enforcement actions of defendants."  Gallegos' Brief at p. 23.  But he does not identify any challenges or appeals that he filed prior to the alleged retaliatory actions.  While Gallegos has alleged that he filed appeals with the City in August 2009 and January 2010, this was after the City engaged in alleged wrongdoing and after the termination of his interest in the subject property.

        Finally, Gallegos claims that the City retaliated against him because he played a role in the decision to locate the Firekeepers Casino outside of the City limits.  *See* Amend. Compl. at ¶ 26 and discussion, *infra*.  Gallegos has not articulated how his actions as a consultant negotiating with City officials for a third party amounted to protected activity under the First Amendment.  Even if Gallegos had established that his position as a consultant involved such protected activity, there is no evidence that the alleged adverse action against Gallegos' was motivated by this activity.  The temporal proximity between protected activity and an adverse action

can provide some circumstantial evidence to support a First Amendment retaliation claim.  *See Smith*, 250 F.3d at 1038.  However, there is no such temporal proximity here.  The Casino negotiations occurred in about 1998, approximately eight years before the City Commission authorized the license agreement in 2006.  Furthermore, the City points out that its two employees involved in making decisions with plaintiff's property, Battle Creek Department of Planning and Community Development Senior Planner Glenn Perian and the Inspections Superintendent Kim Tuck, had no knowledge of Gallegos' history with the City.  Perian testified that since his employment with the City, he had not heard any discussions indicating that the City was upset with Gallegos with respect to the siting of the Casino or with Gallegos' criticisms of the City's planning process.  Perian Dep. at p. 126 (docket no. 82-1 at p. 20).  Similarly, Tuck testified that he was unaware of Gallegos' involvement in selecting the location for the Casino, having first heard of it a few days before his deposition.  Tuck Dep. at pp. 75-76 (docket no. 82-1 at pp. 33-34).  Tuck also testified that he was unaware of Gallegos' criticism of the City's planning.  *Id.* at p. 76.  In the absence of any knowledge of Gallegos' alleged protected conduct, neither Perian nor Tuck had the requisite motivation to retaliate against Gallegos.   Accordingly, the City is entitled to summary judgment on the retaliation claim.

## IV.    Recommendation

For all the reasons discussed above, I respectfully recommend that the City's motion for summary judgment  (docket no. 71) be **GRANTED**, that Gallegos' motion for summary judgment (docket no. 75) be **DENIED**, and that this action be **DISMISSED**.

Dated:  March 1, 2012                                    /s/ Hugh W. Brenneman, Jr.
                                                                      HUGH W. BRENNEMAN, JR.
                                                                      United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).